UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CHRISTY DEAKLE | CIVIL ACTION |
| VERSUS | NO. 20-1554 |
| WESTBANK FISHING, LLC, ET AL. | SECTION "R" (5) |

### ORDER AND REASONS

Before the Court are plaintiff Christy Deakle's motions to exclude and/or limit the testimony of (i) Dr. Marian Sackey and Dr. Erin O'Sullivan,[1] and (ii) Dr. James Traylor.[2] Defendants Westbank Fishing, LLC, the F/V MARIA C, and Certain Underwriters at Lloyd's Syndicates XLC, LIB, and AMA, oppose both motions.[3]

For the following reasons, the Court denies plaintiff's motions.

### I.  BACKGROUND

This case arises out of a death aboard the F/V MARIA C on June 3, 2019. Decedent Bryan Urby was working as a fisherman aboard the vessel

---

[1]  R. Doc. 55.
[2]  R. Doc. 59.
[3]  R. Docs. 61 & 79.

when he began to show signs of heat distress.[4]  The United States Coast Guard airlifted Mr. Urby to University Medical Center ("UMC") in New Orleans, where he was pronounced dead.[5]

At UMC, Dr. Marian Sackey ordered various tests on Mr. Urby, including (1) a urine toxicology screen, and (2) a urine mass spec analysis.[6] In the "Value" column of the toxicology screen results, all tested substances indicate "Not Detected," except for cocaine, whose value column states, "See Confirmation."[7]  Dr. Sackey testified at her deposition that "See Confirmation" refers to the second test, the urine mass spec analysis.[8] The results of Mr. Urby's urine mass spec analysis list "Nicotine and/or metabolite," "Cocaine metabolites," "Caffeine," "Cocaine," and "Cocaethylene."[9]

Following Mr. Urby's death, Dr. Erin O'Sullivan, a forensic pathologist at the Orleans Parish Coroner's Office,[10] conducted an autopsy of Mr. Urby.[11] As part of the autopsy, Dr. O'Sullivan ordered a test of the decedent's blood,

---

[4]  R. Doc. 57-4 at 2-5.
[5]  *See* R. Doc. 57-5 at 3-4; R. Doc. 57-6 at 2; R. Doc. 83-11 at 4.
[6]  *See* R. Doc. 55-3 at 25-26.
[7]  *Id.* at 25.
[8]  R. Doc. 55-6 at 7-8.
[9]  R. Doc. 55-3 at 26.
[10] R. Doc. 71-3 at 20.
[11] *Id.* at 2; *see also id.* at 17-19.

and the vitreous fluid from his eye.[12] The lab results show that Mr. Urby's vitreous fluid contained 61 ng/mL of benzoylecgonine.[13] Dr. O'Sullivan testified that benzoylecgonine is a cocaine metabolite.[14] She further testified that Mr. Urby's "cause of death [was] hyperthermia," and that "his cocaine use may have contributed to his cause of death."[15] Mr. Urby's death certificate lists hyperthermia as the immediate cause of death, and "toxic effects of cocaine" as a significant contributing condition.[16]

Christy Deakle is the personal representative of Mr. Urby and his two children.[17] On May 28, 2020, Deakle filed suit in this Court, alleging that defendants' negligence contributed to Mr. Urby's death.[18]

On June 22, 2021, plaintiff moved to exclude and/or limit the testimony of Dr. Sackey and Dr. O'Sullivan.[19] Plaintiff contends that the doctors should be prohibited from discussing the presence of cocaine in Mr. Urby's system because his results indicated the presence of only a cocaine

---

[12] *See id.* at 17-19.
[13] *Id.* at 18-19.
[14] *Id.* at 8; *see also id.* at 19 ("Benzoylecgonine is an inactive metabolite and chemical breakdown product of cocaine.").
[15] *Id.* at 9. Dr. O'Sullivan's post-autopsy write-up lists four "findings" as to Mr. Urby. The first is hyperthermia, and the second is "[t]oxic effects of cocaine." *Id.* at 17.
[16] R. Doc. 55-3 at 4.
[17] *See* R. Docs. 81-6, 81-7 & 81-8.
[18] R. Doc. 1.
[19] R. Doc. 55.

3

metabolite, rather than parent cocaine, and because the urine mass spec test is unreliable.[20] Plaintiff further argues that the doctors should be prohibited from stating that Mr. Urby was "impaired" at the time of his death because the doctors are not toxicologists, and because his results do not indicate a numerical amount of cocaine metabolite detected.[21] Defendants oppose the motion, contending, among other arguments, that Mr. Urby's system indeed contained parent cocaine, and that Drs. Sackey and O'Sullivan are qualified to opine on the reliable medical tests.[22]

Plaintiff also moved to exclude and/or limit the testimony and expert report of Dr. James Traylor, defendants' medical expert.[23] Specifically, plaintiff objects to Dr. Traylor's conclusion in his expert report[24] that "the use of cocaine by Mr. B. Urby was the inciting event that initiated the sequence of events leading to his fatal hyperthermia that was contributed to

---

[20] R. Doc. 55-1 at 7-8.
[21] *Id.* at 8-10.
[22] R. Doc. 71 at 10-12.
[23] R. Doc. 59.
[24] Plaintiff did not attach Dr. Traylor's report to her motion to exclude Dr. Traylor's testimony. While the motion cites plaintiff's Exhibit A when referring to Dr. Traylor's report, the attached Exhibit A is a report by another of defendants' experts. *See* R. Doc. 59-2. Defendants did not attach Dr. Traylor's report to their opposition. The Court located the report as an exhibit to plaintiff's motion for leave to file a reply in support of her motion regarding Dr. Traylor. *See* R. Doc. 87-3. It is this version of the report that the Court considers on the present motion.

4

by working in a hot environment while clad in improper work attire."[25] Plaintiff argues that Dr. Traylor's report and its conclusions should be excluded because Dr. Traylor makes factual determinations that usurp the role of the jury, and because his conclusions are unsupported by the record.[26] Defendants oppose the motion, contending that all of Dr. Traylor's findings are supported by the record.[27]

The Court considers both motions below.

## II. LEGAL STANDARD

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

---

[25] R. Doc. 87-3 at 3-4.
[26] R. Doc. 59-1 at 4-9.
[27] R. Doc. 69 at 4-7.

5

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court held that Rule 702 "requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Metrejean v. REC Marine Logistics, LLC*, No. 08-5049, 2009 WL 3062622, at *1 (E.D. La. Sept. 21, 2009) (quoting *Daubert*, 509 U.S. at 589). This gatekeeping function applies to all forms of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *See Daubert*, 509 U.S. at 593. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case, and whether it will thereby assist the trier of fact to understand the

6

evidence. In other words, it must determine whether it is relevant. *See id.* at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

The Court's role as a gatekeeper does not replace the traditional adversary system. As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight," rather than the admissibility, of that opinion. *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

## III. DISCUSSION

### A. Dr. Marian Sackey & Dr. Erin O'Sullivan

Plaintiff moves to exclude and/or limit the testimony of Dr. Marian Sackey and Dr. Erin O'Sullivan.[28] Specifically, plaintiff asks the Court to bar Drs. Sackey and O'Sullivan from testifying that cocaine was present in Mr. Urby's system on the day of his death,[29] and that Mr. Urby was "impaired" while aboard the MARIA C, up until his death.[30]

As a preliminary matter, the Court notes that the meaning of plaintiff's latter request is unclear. As to Dr. Sackey, there is no indication that she intends to testify about Mr. Urby's so-called "impairment." She specifically testified at her deposition that she cannot discern a "level of impairment" based on Mr. Urby's medical records.[31] As to Dr. O'Sullivan, her deposition testimony reveals confusion about plaintiff counsel's line of questioning regarding impairment. When asked whether she had reviewed any test results "that would show impairment," Dr. O'Sullivan responded, "I don't know what you mean by the word 'impairment.'"[32] She went on to explain that cocaine can cause "arrhythmias, increased heart rate[,] and many other

---

[28]  R. Doc. 55.
[29]  R. Doc. 55-1 at 7-8.
[30]  *Id.* at 8-10.
[31]  R. Doc. 55-6 at 9.
[32]  R. Doc. 71-3 at 10-11.

things," and reiterated that she did not know how plaintiff's counsel was defining "impairment."[33] She later explained that "taking cocaine itself can cause people to be hyperthermic," which means that it "can cause them to have problems regulating their temperature."[34]

Given this context, the Court construes plaintiff's motion to limit testimony regarding "impairment" as a request that the Court exclude testimony as to how cocaine use may have affected Mr. Urby on the day of his death. Accordingly, the Court's ensuing analysis under *Daubert* and Rule 702 looks specifically to the doctors' testimony that cocaine was in Mr. Urby's system, and the ways in which it may have affected him.

Under Rule 702, both Dr. Sackey and Dr. O'Sullivan are qualified by their "knowledge, skill, experience, training, [and] education," to offer expert testimony interpreting the medical records of Bryan Urby. Fed. R. Evid. 702. Dr. Sackey was Mr. Urby's emergency physician at UMC,[35] and Dr. O'Sullivan conducted Mr. Urby's autopsy at the parish coroner's office.[36] Dr. Sackey specializes in emergency medicine,[37] and Dr. O'Sullivan is a board-

---

[33] *Id.* at 11.
[34] *Id.* at 14.
[35] R. Doc. 55-6 at 2; *see generally* R. Doc. 55-3 (denoting "Marian Araba Sackey, MD" as the "[o]rdering provider" on decedent's tests in the UMC emergency department).
[36] R. Doc. 71-3 at 2, 7-8.
[37] R. Doc. 71-2 at 2-3.

9

qualified forensic pathologist.[38] Dr. O'Sullivan testified that she has been qualified as an expert pathologist in many cases, and has never had her testimony limited.[39]

Plaintiff objects to the doctors' qualifications on the grounds that neither doctor is a toxicologist.[40] The Court finds this argument unpersuasive. Toxicologists or not, both doctors are qualified to interpret toxicology results from tests that they personally ordered. Specialization in a particular field "should generally go to the weight of the evidence, rather than its admissibility." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013); *see also Parker v. John W. Stone Oil Distribs.*, No. 18-3666, 2019 WL 5212285, at *4 (E.D. La. Oct. 16, 2019) (permitting an ENT to testify about the effect of a neurological disease); *Bowie v. Am. Home Assur. Co.*, No. 05-1381, 2009 WL 3254500, at *2 (M.D. La. June 3, 2009) (permitting a spine surgeon to testify about knee injuries); *Harmeyer v. Dohm*, No. 06-4220, 2007 WL 4294667, at *5 (E.D. La. Mar. 7, 2007) (permitting a neurosurgeon to testify about knee pain). Dr. O'Sullivan is particularly qualified in this case, as she had seven years' worth of experience interpreting toxicology results at the time of Mr. Urby's death, and nine

---

38     R. Doc. 71-3 at 2.
39     *Id.* at 3.
40     *See* R. Doc. 55-1 at 8-9.

years' worth at the time of her deposition.[41] *Cf. In re Ingram Barge Co.*, 187 F.R.D. 262, 264 (M.D. La. 1999) (finding a doctor qualified in toxicology despite not being board-certified in toxicology because "his medical practice encompasses [the] field, and he has taught and written extensively in [the] field"). Plaintiff has not pointed to any specific testimony, anticipated or existing, that goes beyond either doctor's qualifications or expertise.

Further, the doctors' testimony is based on reliable reasoning and methodology. *See Daubert*, 509 U.S. at 590-93; Fed. R. Evid. 702(c). Plaintiff's only objection as to reliability is her contention that that the urine mass spec analysis is unreliable, because it does not indicate a numerical quantity of cocaine or cocaine metabolite detected.[42] This argument lacks merit. First of all, plaintiff's assertion that there is no indicum of quantity is contradicted by the record. Mr. Urby's initial toxicology test screened for a threshold level of 150 ng/mL of cocaine metabolite.[43] In order for any cocaine metabolite to be detected, Mr. Urby's urine must have contained at least this threshold amount. Dr. Sackey testified that, because the toxicology screen detected cocaine metabolite, the lab ran a urine mass spec analysis as

---

[41] R. Doc. 71-3 at 16; *see also id.* at 20-22.
[42] R. Doc. 55-2 at 7-8.
[43] R. Doc. 55-3 at 25.

11

a "confirmation test."[44] The mass spec confirmed the presence of cocaine and cocaine metabolite.[45] Furthermore, the presence of cocaine and cocaine metabolite in the mass spec results is consistent with Dr. O'Sullivan's postmortem test of Mr. Urby's vitreous fluid, shown to contain 61 ng/mL of cocaine metabolite.[46] Moreover, even if the record lacked any indication of quantity, it contains evidence that any amount of cocaine is dangerous: Dr. O'Sullivan testified at her deposition that "[t]here is no safe amount of cocaine."[47]

In any case, the Court finds nothing in Rule 702 or *Daubert* requiring that toxicology tests yield numerical results, and plaintiff offers no authority for this proposed quantity requirement. The Court finds that the urine mass spec analysis, which indicates the presence of cocaine and cocaine metabolite, is sufficiently reliable under *Daubert* and Rule 702(c).

The doctors' testimony is also "based on sufficient facts or data." Fed. R. Evid. 702(b). While plaintiff asserts that no parent cocaine was found in Mr. Urby's system,[48] this claim is patently false. The urine mass spec analysis plainly indicates the presence of both "*Cocaine*" and "Cocaine metabolites"

---

44  *See* R. Doc. 55-6 at 5-6, 13.
45  R. Doc. 55-3 at 26.
46  R. Doc. 71-3 at 18.
47  *Id.* at 12.
48  R. Doc. 55-1 at 7.

in Mr. Urby's urine.[49] Both Dr. Sackey and Dr. O'Sullivan testified that Mr. Urby's test results indicated the presence of cocaine.[50] The Court summarily dismisses plaintiff's contention that parent cocaine was not detected in Mr. Urby's system.

Finally, the doctors' testimony plainly "fits" the facts of the case, and will therefore "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Daubert*, 509 U.S. at 591; Fed. R. Evid. 702(d). This case's central issue involves what caused, and who is responsible for, Mr. Urby's death on June 3, 2019. It is therefore essential that the jury have an informed understanding of what factors likely contributed to his death. The doctors' interpretation of Mr. Urby's test results is clearly helpful on this key issue. *Cf. Fowler v. Carrollton Pub. Libr.*, 799 F.2d 976, 983 (5th Cir. 1986) (holding on appeal following a jury trial that the district court erred in "admitting medical records from [plaintiff's] . . . hospital stay with no accompanying expert explanation of their significance").

---

[49] R. Doc. 55-3 at 26 (emphasis added).
[50] R. Doc. 55-6 at 12 (Dr. Sackey's testimony that "cocaine was detected"); R. Doc. 71-3 at 5 (Dr. O'Sullivan's testimony that Mr. Urby's toxicology test was "positive for cocaine.").

13

In sum, the requirements of Rule 702 and *Daubert* are satisfied as to the testimony of Drs. Sackey and O'Sullivan. The Court denies plaintiff's request to prevent the doctors from testifying that cocaine was in Mr. Urby's system on the day of his death, or how cocaine use may have affected him on the day of his death. Plaintiff's concerns as to the basis of the testimony go to weight, and may be addressed on cross-examination. *See Daubert*, 509 U.S. at 596 (citing *Rock*, 483 U.S. at 61); *Hodge*, 933 F.3d at 478 (citing *14.38 Acres of Land*, 80 F.3d at 1077).

For the foregoing reasons, the Court denies plaintiff's motion to exclude and/or limit the testimony of Dr. Sackey and Dr. O'Sullivan.

### B. Dr. James Traylor

Plaintiff also moves to exclude and/or limit the testimony and expert report of Dr. James Traylor, defendants' medical expert.[51] Dr. Traylor's report contains the following: a bullet-point timeline of events leading to Mr. Urby's death; a summary of Dr. O'Sullivan's findings from Mr. Urby's autopsy; a summary of a 2002 scientific article regarding cocaine-induced hyperthermia; a recitation of Mr. Urby's lab results, and a statement that the results are "proof that he used cocaine sometime after his pre-employment

---

[51] R. Doc. 59.

14

urine drug screen"; and, in closing, Dr. Traylor's opinion that "the use of cocaine . . . was the inciting event that initiated the sequence of events leading to [Mr. Urby's] fatal hyperthermia that was contributed to by working in a hot environment while clad in improper work attire."[52]

Plaintiff does not object to Dr. Traylor qualifications. Instead, plaintiff takes issue with Dr. Traylor's testimony that that (i) cocaine use was the inciting event that led to Mr. Urby's death,[53] and (ii) that Mr. Urby was improperly dressed on the day of his death.[54]

Plaintiff objects to Dr. Traylor's statement that Mr. Urby's "use of cocaine . . . was the inciting event that . . . le[d] to his fatal hyperthermia,"[55] on the grounds that this conclusion is contradicted by the record.[56] The Court construes plaintiff's contention as an objection under Rule 702(b), which requires that expert testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b).

The Court finds that Dr. Traylor's conclusion regarding the role of cocaine in Mr. Urby's death is ambiguous as written. If, by this statement, Dr. Traylor intends to convey that cocaine use contributed to Mr. Urby's

---

[52] R. Doc. 87-3 at 3-4.
[53] R. Doc. 59-1 at 5-8.
[54] *Id.* at 5.
[55] R. Doc. 87-3 at 3-4.
[56] R. Doc. 59-1 at 6-8.

15

death, then the statement is admissible. That cocaine played a role in causing Mr. Urby's death is consistent with various parts of the record, including Dr. O'Sullivan's autopsy findings,[57] her statements during her deposition,[58] and Mr. Urby's death certificate,[59] as well as the scientific article cited in Dr. Traylor's report.[60] In arguing that that the record contradicts any conclusions regarding cocaine, plaintiff largely rehashes the same arguments she raises with respect to the testimony of Drs. Sackey and O'Sullivan. For the reasons stated above, the Court rejects those arguments and finds that the record supports testimony that cocaine use contributed to Mr. Urby's death.

If, on the other hand, Dr. Traylor purports to opine that cocaine use was a *greater factor than the heat* in causing Mr. Urby's death—a plausible interpretation of his "inciting event" language—then such a conclusion is inadmissible, as it is unsupported by "sufficient facts or data." *Id.* The study cited in Dr. Traylor's report indicates that cocaine use can be fatal at blood levels of 3 to 6 mg/L, but that cocaine-related deaths can occur at blood levels "10 to 20 times lower" than that when hyperthermia is present.[61] But the

---

57 R. Doc. 71-3 at 17.
58 *Id.* at 9.
59 R. Doc. 55-3 at 4.
60 R. Doc. 87-3 at 3.
61 *Id.*

16

record lacks any indication of blood cocaine levels for Mr. Urby. The tests discerned cocaine in his urine,[62] and cocaine metabolite in his urine and vitreous fluid.[63] No witness, including Dr. Traylor, has opined on, or even suggested that it would be possible to know, Mr. Urby's blood cocaine level on the day of his death. Without such a metric, Dr. Traylor is unable to support a conclusion that cocaine use was any more of a factor in Mr. Urby's death than the heat.

Accordingly, the Court construes Dr. Traylor's conclusion regarding the role of cocaine as an opinion that cocaine use contributed to Mr. Urby's death, and denies plaintiff's request to exclude his testimony. Dr. Traylor may testify at trial that cocaine use contributed to, or was a factor in, Mr. Urby's death. Dr. Traylor may not testify that cocaine use was the primary cause of Mr. Urby's death, or otherwise opine that cocaine use played a greater role than the heat in causing his death.

As to Dr. Traylor's statement that Mr. Urby was "clad in improper work attire,"[64] plaintiff contends that this conclusion is a factual determination that must be left to the jury.[65] But Dr. Traylor does not purport to offer his

---

[62] R. Doc. 55-3 at 26.
[63] *Id.*; R. Doc. 71-3 at 18.
[64] R. Doc. 87-3 at 4.
[65] R. Doc. 59-1 at 5.

17

*own* opinion on whether Mr. Urby was properly dressed. The record contains extensive testimony from other crewmembers as to what Mr. Urby was wearing, and their views, based on experience, that his clothing was improper given the heat.[66] Dr. Traylor appropriately relies on this testimony in offering his medical opinion that improper dress contributed to Mr. Urby's fatal hyperthermia. *See Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness [under] Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation . . . ."). Dr. Traylor's reliance on the sworn testimony of the crewmembers does not amount to an impermissible determination of witness credibility, nor does it otherwise invade the province of the jury. *See United States v. Deville*, 278 F.3d 500, 506 (5th Cir. 2002). The Court therefore permits Dr. Traylor's testimony that improper clothing in the heat contributed to Mr. Urby's death.

For the foregoing reasons, the Court denies plaintiff's motion to exclude and/or limit the testimony of Dr. Traylor.

---

[66]  *See, e.g.*, R. Doc. 59-5 at 7; 59-6 at 9; 59-7 at 9; 59-9 at 5; 59-10 at 3; 59-13 at 4; 59-14 at 3.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES plaintiff's motion to exclude and/or limit the testimony of Dr. Marian Sackey and Dr. Erin O'Sullivan. The Court further DENIES plaintiff's motion to exclude and/or limit the testimony of Dr. James Traylor.

New Orleans, Louisiana, this __21st__ day of September, 2021.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE